IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIAN W. RICE,                           :            Case No. 1:14 CV 0305

              Plaintiff,            :

v.                                        :

COMMISSIONER OF SOCIAL SECURITY,          :            MEMORANDUM DECISION AND ORDER

              Defendant.            :

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties consented to have the undersigned Magistrate Judge conduct all proceedings in this case including ordering the entry of final judgment. Plaintiff seeks review of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U. S. C. §§ 1381 *et seq.* Pending are the Briefs of the parties (Docket Nos. 17, 20) and Plaintiff's Reply Brief (Docket No. 21). For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On October 5, 2009, Plaintiff completed an application for DIB, alleging that he became unable to work because of his disabling condition on January 19, 2003 (Docket No. 13, pp. 202-232 of 2143). The application was denied initially on February 5, 2010 (Docket No. 13, pp. 99-105 of 2143) and upon

reconsideration on April 29, 2010 (Docket No. 13, pp. 107-112 of 2143).

On June 23, 2010, Plaintiff requested an administrative hearing and on April 7, 2011, a notice of hearing on May 9, 2011and an acknowledgment form were forwarded to Plaintiff (Docket No. 13, pp. 113, 136-140 of 2143).  Plaintiff did not complete and return the acknowledgment form and on April 25, 2011, a reminder of hearing notice was forwarded (Docket No. 13, pp. 154-157 of 2143).

On May 9, 2011, James Hill, an Administrative law Judge (the ALJ), presided over a hearing at which Plaintiff failed to appear; however, Plaintiff's counsel appeared and Ted Macy, a Vocational Expert (VE) testified (Docket No. 13, pp. 73-81 of 2143).  On May 12, 2011, a notice to show cause for failure to appear was issued to Plaintiff (Docket No. 13, pp. 158-168 of 2143).  Plaintiff failed to appear or respond to the notice to show cause and on June 15, 2011, ALJ Hill dismissed Plaintiff's claim (Docket No. 13, pp. 84-86 of 2143).

Counsel Samantha Xander requested review of the decision to dismiss on August 17, 2011 (Docket No. 13, pp. 170-172 of 2143).  The Appeals Council remanded the case to the ALJ on December 14, 2011 (Docket No. 13, pp. 89-92 of 2143) and on August 20, 2012, the ALJ presided over a hearing at which Plaintiff, represented by counsel, and William Kiger, a VE, appeared and testified (Docket No. 13, pp.. 34-36 of 2143).  On September 13, 2012, ALJ Hill rendered an unfavorable decision (Docket No. 13, pp. 15-26 of 2143).  The Appeals Council found no reason to review the ALJ's decision; therefore, the ALJ's decision denying benefits became the final decision of the Commissioner on December 16, 2013 (Docket No. 13, pp. 6-9 of 2143).

Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying him benefits (Docket No. 1).

### III. THE ADMINISTRATIVE HEARING.

The parties agree that the onset date was fixed on January 19, 2003 and the date last insured was September 30, 2008.  The testimony of Plaintiff and the VE is limited to evidence that predates Plaintiff's date last insured (Docket No. 13, p. 38 of 2143).

**A.    PLAINTIFF'S TESTIMONY.**

Plaintiff testified that he weighed 180 pounds from January 19, 2003 through September 30, 2008.  At the time of hearing, he weighed 230 pounds and was 5'11" tall.  A divorcee, Plaintiff was 53 years of age;  he had completed the 12th grade and  could read and write.  He did not possess a valid driver's license; however,   he was able to use public bus transportation (Docket No. 13, pp. 41-43 of 2143).

Currently Plaintiff lived with a roommate (Docket No. 13, p. 56 of 2143).  During the relevant time period, Plaintiff resided with his mother who cooked and did his laundry.  Relieved of these household chores,  Plaintiff could watch television or read.  A psychosis interfered with Plaintiff's ability to function, specifically, his ability to concentrate (Docket No. 13, pp. 55, 56-57 of 2143).

Plaintiff served two years active duty in the United States Army post Vietnam and four years in the inactive reserves (Docket No. 13, p. 43 of 2143).  In 1997 and 1998, Plaintiff was employed at Siebold Company as a millwright superintendent and installed automation for the post office.  He generally stood more than three hours daily and occasionally lifted 100 pounds or more while supervising and managing a crew in the construction of machinery (Docket No. 13, p. 44 of 2143).  In 1999, Plaintiff was employed by now defunct Exterior Systems to installed windows in the Adams Mark Hotel in Clearwater Beach, Florida (Docket No. 13, p. 44 of 2143).  Plaintiff also recalled that he was employed for "a couple of years" as a maintenance superintendent at DuraCoat, a resin and

3

coating chemical company; and he had temporary assignments which included the installation and replacement of glass in commercial establishments (Docket No. 13, pp. 44-46 of 2143; www.duracoat.com).

Plaintiff was diagnosed with (1) gastroesophageal reflux disease (GERD); (2) Barrett's Esophagus, a chronic ulceration of the lower esophagus; (3) panic disorder with agoraphobia; (4) arthralgia or pain in a joint; (5) Hepatitis C; (6) a retina detachment; (7) absence of the lens of the eye; (8) myopia or nearsightedness; (9) depression; and (10) insomnia. The associated symptoms of these diseases included (1) general fatigue; (2) inability to deal with people; (3) lack of strength and dexterity; and (4) the inability to concentrate (Docket No. 13, p. 48 of 2143). The side effects of all the medications taken to control his symptoms included nausea and feelings of drunkenness (Docket No. 13, p. 61 of 2143; STEDMAN'S MEDICAL DICTIONARY 397030 (27th ed. 2000)).

During an industrial explosion in 1984, Plaintiff's entire cornea was peeled. The corneal graft was not successful in restoring his sight. Similarly, the retina detachment repair to place the detached retina of the right eye back to its normal position was unsuccessful. During the relevant time period, Plaintiff was blind in his right eye and the vision in his left eye was corrected with lenses (Docket No. 13, pp. 49-50 of 2143).

Plaintiff had a history of hepatitis C, a viral disease that leads to swelling of the liver. His treating physician attributed the pain in his right hip and right shoulder to this disease (Docket No. 13, pp. 50-51 of 2143; www.cdc.gov/hepatitis/c/cfaq/htm).

With respect to the symptoms of depression, Plaintiff generally woke up feeling sluggish and in a dark fog accompanied by fatigue These symptoms lingered throughout his day. Plaintiff testified that he was unable to experience the pleasures of life; he occasionally had feelings of worthlessness and

4

had entertained thoughts of suicide.  Episodes of depression tended to breed a sedentary lifestyle which in turn, led to overeating.  Occasionally the anxiety and depression caused irritability that resulted in irrational outbursts of anger (Docket No. 13, pp. 53-54, 60, 62 of 2143).

Plaintiff's panic attacks were similar to a heart attack as his chest restricted and the room closed in around him.  With the onset of a panic attack came disorientation.  Neither Plaintiff nor his treating psychologists could pinpoint the trigger.  This fear of panic resulted in Plaintiff becoming housebound and avoiding public places (Docket No. 13, pp. 54-55 of 2143).

Plaintiff testified that he suffered from insomnia during the relevant time period and it was difficult to determine if napping adversely affected his ability to sleep.  With drug therapy, he could sleep up to three hours (Docket No. 13, p. 56 of 2143).

Plaintiff had daily joint pain concentrated on his right side and lower back.  He noticed that the severe shoulder pain affected his ability to reach overhead.  The back pain radiated to his buttocks (Docket No. 13, pp. 60, 61 of 2143).

Plaintiff estimated that he could stand for up to thirty minutes without pain; walk for an hour at a time; and sit for an hour with his feet elevated.  Bending allowed stomach acid to reach his pharynx and mouth (Docket No. 13, pp. 51, 52, 53 of 2143).

**B.**     **THE VE'S TESTIMONY.**

The VE acknowledged that he was an impartial witness and he stated that if his testimony was inconsistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), he was obliged to advise of the conflict (Docket No. 13, pp. 63, 64 of 2143).

Initially the VE categorized Plaintiff's past relevant jobs–millwright and glazier–according to its description in DOT, physical exertion requirements and specific vocational preparation or the level

5

of time required by a typical worker to learn the techniques, acquire the information and develop the

facility needed for average performance of the Plaintiff's past relevant work:

| Job | DOT | Physical exertion | SVP |
|-----|-----|-------------------|-----|
| Millwright | 638.281-014 | Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. § 404.1567(d) | Over two years up to and including four years. |
| Glazier | 865.381-010 | Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c). | Over two years up to and including four years. |

(Docket No. 11, pp. 64-65 of 2143; Www.onetonline.org/help/online/svp).

The ALJ posed the first hypothetical question to the VE:

Assume a younger person with a high school education and Plaintiff's work history; can perform light work but cannot climb ladders, ropes or scaffolds. Assume this person must avoid even moderate exposure to vibration and all exposure to dangerous machinery and unprotected heights. Assume this person cannot perform any work requiring depth perception or wide visual fields. Assume this person cannot drive commercial vehicles. Assume this person cannot work in the vicinity of food preparation or food service. Assume this person can understand, remember, and carry out simple instructions and perform simple, routine tasks. Assume this person requires a low-stress work place without strict quotas or fast-paced high production demands. Assume this person is limited to superficial contact with the public and occasional contact with co-workers. And assume this person can only occasionally stoop, kneel, crouch and crawl.

The VE opined that this individual could not perform any of Plaintiff's past work. Rather, there

were two light, unskilled jobs that the hypothetical Plaintiff could perform and such jobs were available

in the region and nation as follows:

| Job/DOT | Regional Availability | National Availability |
|---------|----------------------|----------------------|
| Housekeeping Cleaner 323.687-014 | 400 | 223,000 |
| Machine Operator 529.685-162 | 600 | 130,000 |

(Docket No. 13, pp. 64-65 of 2143).

In the second hypothetical, the ALJ asked the VE to assume the individual described in the first

6

hypothetical was limited to sedentary work and that all of the restrictions set forth in hypothetical question one remain.  The VE opined that there were sedentary, unskilled jobs that this hypothetical person could perform as follows:

| Job/DOT | Regional Availability | National Availability |
| --- | --- | --- |
| Production worker/779.687-038 | 100 | 20,000 |
| Machine Operator/690.685-194 | 40 | 22,000 |
| Packer/920.687-030 | 25 | 15,000 |

(Docket No. 13, pp. 66-67 of 2143).

The ALJ posed a third hypothetical question to the VE:

Assume the individual described in hypothetical number 2 must be permitted to elevate his legs at least 90 degrees while sitting.  Are there any jobs that this individual could perform?

The VE explained that there were no jobs that would accommodate this requirement (Docket No. 13, pp. 67-68 of 2143).  Furthermore, the VE explained that assuming the hypothetical person described in question 2, would be off-task at least 20% of the work day and/or would be absent at least three to four days per month, both light and sedentary jobs would be eliminated from the pool of employment opportunities (Docket No. 13, p. 68 of 2143).

## IV.  THE MEDICAL EVIDENCE.

It is well established that in order to be entitled to DIB, the claimant must establish disability while insured for benefits.  42 U.S.C. §§ 423(a)(1)(A) (Thomson Reuters 2014).  The following is a summary of medical evidence that pertains to Plaintiff's disability prior to the expiration of his insured status.  Medical evidence that postdates the insured status date is considered only insofar as it bears on Plaintiff's condition prior to the expiration of insured status.

7

Dr. Ana F. Martinez, a psychiatrist, diagnosed Plaintiff with a panic disorder and agoraphobia and on March 31, 2003, she commenced drug and psychotherapy to assist Plaintiff in managing his anxiety attacks. Using the standardized scale to subjectively rate how well or adaptively Plaintiff met the various problems in living overall, Dr. Martinez opined that Plaintiff had poor memory; mood disturbances; an inability to experience pleasure from activities generally considered enjoyable; feelings of guilt/worthlessness; decreased energy and generalized persistent anxiety (Docket No. 13, pp. 310-312 of 2143; www.healthgrades.com/physician/dr-ana-martinez).

Dr. Martinez also concluded that Plaintiff was employable provided he engaged in low stress work that accommodated (1) *moderate* limitations in his ability to understand and remember detailed instructions, carry out detailed instructions and work in coordination with or proximity to others and (2) *mild* limitations in the ability to remember locations and work-like procedures and the ability to understand and remember one or two-step instructions (Docket No. 13, pp. 312-315, 316 of 2143).

On March 25, 2003, Dr. Mary Ann Richmond, a specialist in internal medicine and spinal cord injury medicine, counseled Plaintiff about the risks of tobacco use and administered a depression screening, and a post-traumatic stress disorder (PTSD) screening. Neither the depression screening tool nor the PTSD screening tool indicated that Plaintiff suffered from depression or that he had behavioral symptoms of PTSD (Docket No. 13, pp. 452-453 of 2143; www.healthgrades.com/physician/dr-mary-richmond).

Clinical social worker, Dr. Janet E. Werkner, Ph.D., conducted an evaluation on March 31, 2003, for purposes of creating a multi-disciplinary treatment plan to include supportive intervention for smoking cessation, vocational rehabilitation and financial claims assistance. Using the standardized scale to subjectively rate how well or adaptively Plaintiff met the various problems in living overall,

Dr. Werkner opined that Plaintiff had moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 13, pp. 447-451 of 2143; www.healthgrades.com/provider/janet-werkner).

Plaintiff participated in a psychotherapy group session on April 1, 2003, during which Plaintiff concentrated on smoking cessation and stress management techniques used to prevent relapse (Docket No. 13, pp. 1070-1071 of 2143).

Beginning on April 2, 2003, Dr. Allen E. McLaughlin, M.D., a specialist in psychiatry, monitored and reconciled Plaintiff's medication intake, starting first with prescribing a trial run of an anti-depressant medication and an anti-anxiety medication (Docket No. 13, pp. 443-444 of 2143; www.healthgrades.com/physician/dr-allan-mclaughlin).  On April 9, he added to the drug regimen a short acting anti-psychotic medication (Docket No. 13, p. 442 of 2143).  On April 16, he discontinued the anti-psychotic medication because it caused nausea and increased the dosage of medications used to treat panic disorders and anxiety (Docket No. 13, p. 441 of 2143) and on April 23, he prescribed a sleep aid (Docket No. 13, p. 1065 of 2143).

On May 19, 2003, rehabilitation counselor, Thomas Liverett, noted that Plaintiff had covered most of the bases in preparing for and seeking employment.  Mr. Liverett added his opinion regarding Plaintiff's employability, providing all possible information he had on the labor market and recommending attitude and behavioral modifications (Docket No. 13, p. 1062 of 2143).

On February 7, 2007,  Plaintiff presented to Dr. Sudheera Kalepu, a specialist in internal medicine, complaining of worsening acid reflux, shoulder pain and hip pain.  Dr. Kalepu increased the dosages of Plaintiff's medications and referred him for mental health assessment, an optometry consultation and a gastrointestinal (GI) consultation (Docket No. 13, pp. 456-461 of 2143; www.healthgrades.com/physician/dr-sudheera-kalepu).

9

On February 26, 2007, Dr. Michael H. Lee, M.D., conducted the GI consultation and recommended that Plaintiff undergo an esophagogastroduodenoscopy (EGD) "with jumbo biopsies" (Docket No. 13, pp. 462-463 of 2143).

On February 28, 2007, Dr. Werkner conducted a consultation during which she reaffirmed that Plaintiff had a panic disorder with agoraphobia, an associated depressive disorder and a severe sleep disorder.  Rating how effective Plaintiff was at meeting the various problems in living, Dr. Werkner subjectively rated Plaintiff as suffering with moderate symptoms or moderate difficulty in social, occupational, or school functioning.  She devised a plan to engage Plaintiff in psychiatric treatment, supportive/problem solving therapy and smoking cessation therapy and to link Plaintiff with certain social services to assist with pursuit of financial and transportation assistance (Docket No. 13, pp. 464-470 of 2143).

Complaining of cloudy vision for "quite a while," Plaintiff presented for an optometry consultation on March 6, 2007.  Dr. William W. McGann diagnosed Plaintiff as having corneal haze secondary to the absence of a lens of the eye due to surgical removal of a lens (Docket No. 13, pp. 471-472 of 2143).

On March 6, 2007, Plaintiff discussed alternate pain medication with Registered Nurse Valerie L. Hall.  Dr. Kalepu suggested that Plaintiff adjust his present regimen, limiting the Tylenol and Vicodin pending further radiological examination (Docket No. 13, pp. 474-476 of 2143).

On April 17, 2007, Plaintiff explained that he continued to average two panic attacks weekly and suffer with insomnia.  Acknowledging that Plaintiff had taken the most common antidepressants such as Paxil, Trazodone and Wellbutrin, with minimal success in controlling his symptoms, Dr. Martinez added an anti-panic/sleep aid to the drug therapy (Docket No. 13, pp. 1035-1036 of 2143).

10

Plaintiff was treated at the emergency room on April 22, 2007, for flu-like symptoms and  he was given an IV and morphine.  He presented to the Ravenna Primary Care facility on May 3, 2007, with a fever and blood in the stool (Docket No. 13, pp. 477-479 of 2143).  Plaintiff was admitted to the hospital on May 4, 2007, with suspected pneumonia.  However, the diagnostic evidence of the chest administered on May 8, 2007 showed unremarkable thyroid lobes, no evidence of pleural effusion, no evidence of acute cardiopulmonary process and no significant lung pathology.  The evidence did show fatty infiltration of the liver (Docket No. 13, pp. 1208-1210 of 2143).  Ultimately, Plaintiff was diagnosed and treated for a viral gastrointestinal infection (Docket No. 13, pp. 484-485, 487-496 of 2143).

By May 15, 2007, Plaintiff was feeling better.  He stopped taking Tramadol, a narcotic-like pain reliever used to treat moderate to severe pain, because of the side effects and Dr. Kalepu supplemented Plaintiff's pain therapy with a pain reliever administered intramuscularly.  He had developed a rash which was treated with a topical ointment applied twice daily (Docket No. 13, pp. 497-498 of 2143; 2143; www.drugs.com/tramadol.html)).

On May 29, 2007, Plaintiff underwent another EGD under moderate sedation (Docket No. 13, pp. 940-942 of 2143).

Dr. Martinez noted that Plaintiff was still having panic attacks but he had learned to deal with the symptoms behaviorally.  On June 20, 2007, her subjective assessment of how well or adaptively Plaintiff was meeting the various problems in living indicated that Plaintiff had moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 13, pp. 499-500 of 2143).

On June 21, 2007, Plaintiff's mental health counselor provided a systematic approach to dealing with panic attacks.  The counselor advised that during the next session, he would demonstrate the

11

Progressive Deep Muscle Relaxation, a technique that involves tensing specific muscle groups and then relaxing them, to create awareness of tension and relaxation and to help reduce anxiety (Docket No. 13, pp. 935-936 of 2143; www.cci.health.wa.gov.au/resources/progressive muscle relaxation).

On October 17, 2007, Plaintiff was diagnosed and treated for acute bronchitis.  A prescription of Vicodin was continued for treatment of symptoms associated with rheumatoid arthritis (Docket No. 13, pp. 509-510 of 2143).

On November 14, 2007, Plaintiff underwent rheumatoid arthritis screening in his right ankle, right wrist, hand and foot.  There was no evidence of significant abnormality of the bone, joints or adjacent soft tissue in the ankle and no evidence of osteoarthritis or significant joint abnormality in either the right wrist, hand or foot (Docket No. 13, pp. 1200-1207 of 2143).

Plaintiff reported to Dr. Martinez on November 16, 2007, that his arthritis pain was worsening and his sleep pattern improved.  Medication reconciliation was discussed with Plaintiff and his prescriptions were continued.  Dr. Martinez's subjective assessment of how well or adaptively Plaintiff was meeting the various problems in living suggested he had only moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 13, pp. 514-516 of 2143).

Dr. Kalepu reassessed Plaintiff's condition and performed medication reconciliation from both VA and non-VA sources on January 28, 2008 and March 7, 2008.  Dr. Kalepu recommended smoking cessation, exercise and continued mental health treatment (Docket No. 13, pp. 517-520, 521-525 of 2143; www.healthgrades.com/physician/dr-sudheera-kalepu).

On April 1, 2008, Plaintiff presented to Dr. Martinez complaining that he could not maintain work,  could not sleep,  had increased panic attacks and a recurrence of pancreatitis.  Dr.  Martinez assessed how well or adaptively Plaintiff was meeting the various problems in living suggesting that he had serious symptoms or any serious impairment in social, occupational, or school functioning.  She

suggested adding Cymbalta to the drug regimen to treat anxiety (Docket No.13, pp. 526-528 of 2143).

On April 2, 2008, Dr. Mark E. Schulte, a rheumatologist, found radiological evidence which showed an old fracture deformity involving the right femur; however, Plaintiff's hands, ankles and shoulder showed no evidence of acute bony abnormality, fracture or dislocation.  Although he ruled out inflammatory arthritis, Dr. Schulte added Flexeril, a medication that treats pain and stiffness caused by muscle spasm, to the drug regimen pending further evaluation (Docket No. 13, pp. 424, 529-532 of 2143; www.healthgrades.com/physician/dr-mark-schulte).

On April 29, 2008, Dr. Kalepu determined that since Dr. Schulte ruled on rheumatoid arthritis, Plaintiff's joint pain was most likely related to Hepatitis C (Docket No. 13, pp. 529-536 of 2143).

While working under a car, a thin sheet metal fell in his eye.  Plaintiff was treated in the emergency department for eye trauma.  On May 4, 2008, Plaintiff presented to the ophthalmology department because the pain in his eye had intensified and he was sensitive to light.  Diagnosed with a corneal abrasion, Plaintiff was prescribed Tylenol 3 for pain (Docket No. 13, pp. 542- 550 of 2143).

Plaintiff was treated by a readjustment therapist on May 8, 2008.  The plan included providing an individual counselor to assist with eliminating/reducing the frequency and intensity of panic attacks (Docket No. 13, pp. 869-872 of 2143).

On September 24, 2008, Plaintiff complained that he suffered an adverse reaction to Tramadol.  Dr. Kalepu supplemented Plaintiff's pain therapy with a pain reliever administered intramuscularly (Docket No. 13, pp. 551-556, 862-865, 1597-1600 of 2143).

Plaintiff saw and/or was treated by Drs. Kalepu and Martinez on April 30, 2009.  Dr. Kalepu refused to prescribe opoids for pain; rather, he recommended that Plaintiff lose weight, adopt a low cholesterol diet, exercise and follow up with the GI and Hepatitis C consultations (Docket No. 13, pp. 1584-1590 of 2143).  Dr. Martinez determined that Plaintiff could not use Cymbalta and she restarted

Plaintiff on Klonopin and Restoril, medications used to treat anxiety, depression and insomnia (Docket No. 13, pp. 564-567 of 2143).

To determine the complexity of Barrett's Esophagus, a serious complication of GERD, Plaintiff was admitted to the hospital on May 9, 2009, to undergo a cardiovascular assessment and an EGD (Docket No. 13, pp. 590-591 of 2143). Plaintiff developed dyspnea during the cardiac stress test which was also limited by Plaintiff's severe right leg pain. Plaintiff had a normal sinus rhythm and there were no electrocardiogram changes of myocardial ischemia. There were four quadrant biopsies taken and a small hiatal hernia detected. Dr. Jachi George Sun, an internist, recommended that Plaintiff continue the medications used to reduce the amount of stomach acid and set up EGD evaluation in six months, as further surveillance for Barrett's Esophagus (Docket No. 13, pp.569-572, 1771-1779 of 2143; www.healthgrades.com/physician/dr-jachi-sun).

Plaintiff presented on June 5, 2009, complaining that his Hepatitis "B" had flared, causing pain which was distinguishable from his arthritis pain. Dr. Kalepu refilled Plaintiff's active medications used to treat joint pain and body aches (Docket No. 13, pp. 569-596 of 2143).

On June 18, 2009, Plaintiff was treated by Licensed Practical Nurse (LPN) George J. Stastny, Dr. Kalepu and Dr. Martinez. LPN Stastny administered a pain reliever intramuscularly in the right deltoid (Docket No. 13, p. 1485 of 2143). Dr. Kalepu give Plaintiff a Hepatitis C consultation for purposes of completing his Social Security disability claim (Docket No. 13, pp. 597-601 of 2143). Dr. Martinez increased the prescription for Zoloft to control Plaintiff's panic attacks. Dr. Martinez noted that Plaintiff exhibited serious symptoms or a serious impairment in social, occupational, or school functioning and he was not meeting various life pressures well (Docket No. 13, pp. 602-604 of 2143).

Plaintiff presented to the dental clinic on July 6, 2009, but he was ineligible for routine dental care (Docket No. 13, pp. 1483-1485 of 2143). On July 13, 2009, Plaintiff was treated at the emergency

14

room for dental pain.  Unable to obtain an extraction, Plaintiff was advised to try an over-the-counter lidocaine jelly for pain and follow-up with a dentist (Docket No. 13, pp. 1476-1481 of 2143).

In the meantime, Plaintiff consulted with Dr. Katarina B. Greer, M. D., a specialist in gastrointerology, who suggested that Plaintiff's condition was stable and that he need not repeat the EGD for three years (Docket No. 13, pp. 1481-1482 of 2143; www.healthgrades.com/physician/dr-katarina-greer).

Plaintiff was treated at the emergency room for dental pain on July 13, 2009.  Having never been treated for Hepatitis C, Plaintiff underwent a heptology consultation (Docket No. 13, pp. 396-402 of 2143).

On July 15, 2009, Dr. Kalepu conducted a medication reconciliation and examined the status of  Plaintiff's low grade dysplasia, a precancerous condition in which cells which are very similar to cancer cells grow in an organ but have not yet acquired the ability to metastasize (Docket No. 13, pp. 1466-1471 of 2143; http://pathology2jhu.edu/beweb/dysplasia.cfm).

On July 20, 2009, Readjustment Therapist, Monica Reider, constructed an intervention plan with goals of eliminating Plaintiff's reaction to the intensity associated with avoiding people and decreasing the number of self reported panic attacks (Docket No. 13, pp. 1456-1466 of 2143).

On August 13, 2009, Physician Assistant Richard D. Pulice reported that Plaintiff felt better and slept better while on Zoloft.  Dr. Martinez conducted a medication reconciliation review and determined to "stay the course" (Docket No. 13, pp. 374-376, 1452-145 of 2134).

On September 17, 2009, Dr. William W. McGann, O.D., a specialist in optometry, diagnosed Plaintiff with corneal haze secondary to the procedure in which a donor cornea was transplanted, a stable retinal tear and compound myopic astigmatism with presbyopia (Docket No. 13, pp. 865-867 of 2143; www.healthgrades.com/provider/william-mcgann).

On September 22, 2009, Dr. Martinez conducted a medication reconciliation.  Notably, the depression screening was negative for depression (Docket No. 13, pp. 1447-1451 of 2143).

Facing economic hardship and homelessness, Plaintiff contacted the suicide hotline for assistance on September 28, 2009 (Docket No. 13, pp. 335, 366-369 of 2134).

On October 1, 2009, Plaintiff was treated for pain after falling backwards down the stairs (Docket No. 13, pp. 360-364 of 2134).

### V.  STANDARD OF DISABILITY DETERMINATION.

The Commissioner's regulations governing the evaluation of disability for DIB is found at 20 C. F. R. § 404.1520.  DIB is available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is

16

presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## VI. THE ALJ'S DECISION.

Taking into account the standard of disability set forth above, the ALJ considered the testimony, medical evidence and argument to make the following findings of fact and conclusions of law:

1. Plaintiff last met the insured status requirements of the Act on September 30, 2008. Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of January 19, 2003 through the date last insured of September 30, 2008.

2. Through the date last insured, Plaintiff had the following severe impairments: (1) panic disorder with agoraphobia, (2) depression; (4) Hepatitis C; (5) remote retinal detachments; and (5) aphakia.

3. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.920(d), 404.925, 404.926).

4. After careful consideration of the entire record, the ALJ found that through the date last insured, Plaintiff had the residual functional capacity to perform light work as defined in 20 C. F. R. § 404.1567(b), except that Plaintiff could not climb ladders, ropes or scaffolds. He could only occasionally stoop, kneel, crouch and crawl. He had to avoid even moderate exposure to vibration and all exposure to dangerous machinery and unprotected heights. Plaintiff could not perform any work requiring depth perception or wide visual fields. He could not drive commercial vehicles. He could not work in the vicinity of food preparation or food service. Plaintiff could understand, remember

and carry out simple instructions and perform simple, routine tasks.  He required a low stress workplace without strict quotas or fast-paced high production demands.  Plaintiff was limited to superficial contact with the public and occasional contact with others.

5.     Through the date last insured, Plaintiff was unable to perform any past relevant work.

6.     Plaintiff was born on October 15, 1958 and was 49 years old, which is defined under 20 C.F.R. § 404.1563(c) as a younger person under 50, on the date last insured.  Plaintiff subsequently changed age category to closely approaching advanced age.

7.     Plaintiff had a least a high school education and is able to communicate in English.

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferrable skills.

9.     Through the date last insured, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

10.    Plaintiff was not under a disability, as defined in the Act, at any time from January 19, 2003, the alleged onset date, through September 30, 2008, the date last insured (Docket No. 13, pp. 18-26 of 2143).

### VII. STANDARD OF REVIEW.

Congress has provided a limited scope of review by the district court for Social Security administrative decisions under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.  *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)).  Therefore, the district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The

findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . .  *Id.*  This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VIII.  ANALYSIS.

Plaintiff asserts four claims:

1. The ALJ failed to seek medical expert (ME) advice.
2. The ALJ made a residual functional capacity finding based on no medical source finding.
3. The ALJ failed to apply the correct legal standard in evaluating Dr. Martinez' opinions.
4. The ALJ failed to consider Dr. Martinez' May 12, 2012, opinion.

Defendant contends that the ALJ reasonably evaluated Plaintiff's residual functional capacity and properly weighed Dr. Martinez' opinion.  In sum, Defendant maintains that the ALJ's decision is based on substantial evidence and the Commissioner's decision should be affirmed.

## 1.  MEDICAL EXPERT OR CONSULTATIVE EXAMINER?

Plaintiff argues that the ALJ erred in failing to obtain ME testimony or a consultative examination for purposes of filling in the gap between Plaintiff's joint pain secondary to Hepatitis C and the functional limitations resulting therefrom.

### A.  MEDICAL EXPERT.

The ALJ's primary reason for seeking the advice of a ME is to gain a better understanding of the medical evidence in complex cases.  *Richardson v. Perales*, 91 S. Ct. 1420, 1431 (1972).  As a neutral adviser, the ME's purpose is to explain technique and significance of medical terms and findings in assessing the claimant's condition.  *Id.*

The Commissioner's operations manual indicates that an ALJ's decision whether a ME is necessary is inherently discretionary.  HALLEX I–2–5–32 (September 28, 2005).  Manual provisions

19

address situations in which the ALJ **may** need to obtain an ME's opinion such as when the ALJ believes an ME may be able to clarify and explain the etiology or course of a disease, make an equivalency determination or explain that the impairment may affect the claimant's ability to engage in work activities at pertinent points in time or to explain or clarify the claimant's functional limitations and abilities as established by the medical evidence of record.  HALLEX I-2-5-34 (September 28, 2005). The ALJ abuses his or her discretion only when the testimony of a ME is required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.  *See* 20 C.F.R. § 404.944 (Thomson Reuters 2014).

Alternately, there are two circumstances in which an ALJ **must** call on a ME to provide an updated opinion:  when "(1) there is evidence of symptoms, signs and findings that suggest to the [ALJ] ... that the applicant's condition may be equivalent to the listings; or (2) when additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment does not equal the listings."  *Baumbach v. Colvin*, 2014 WL 1321011, 3 (N.D.Ohio,2014) (*citing Kelly v. Commissioner of Social Security*, 314 F. App'x 827, 830 (6th Cir.2009); *see also* POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE   FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM  PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE,  SOCIAL SECURITY RULING 96–6p, 1996 WL 274180, *3 (July 2, 1996)).

The Magistrate is persuaded that there is nothing in the record that would compel the ALJ to obtain the advice of a ME regarding functional limitations resulting from Plaintiff's joint pain secondary to Hepatitis C and mental impairment.  Notably, the medical record was unambiguous and adequate to make a determination as to the functional limitations derived from these impairments.  The ALJ was

not required to discuss or make analytical judgments regarding Plaintiff's mental impairment or arthritis/joint pain because the treating sources had already done this for him, rendering medical records which required neither clarification nor edification.

With respect to whether Plaintiff's condition may be equivalent to the Listings, the signatures of Drs. Steiger and Klyop, State agency psychological and medical consultants, on the disability determination form, ensure that at the very least, consideration of medical equivalence at the initial and reconsideration levels of administrative review. Furthermore, the evidence from medical care and treatment rendered after the expiration of insured status lacks the probative force to change the State agency medical or psychological consultant's finding that the impairment does not equal the listings.

The limited circumstances under which ME testimony is required were not triggered here. The ALJ declined to obtain ME testimony as there was adequate evidence regarding the nature and severity of Plaintiff's condition upon which to base his decision. The raw medical evidence and clinical history prior to the conclusion of Plaintiff's insured status showed a history of arthritis and joint pain secondary to Hepatitis C. In the opinions of Drs. Kalepu and Martinez, Plaintiff's ability to socialize, work or engage in other productive activities was suggestive of moderate functional limitations derived from arthritis and joint pain (Docket No. 13, pp. 514-516, 529-536 of 2143). In short, the case lacked the complexity that required a ME to explain the medical problems and their treatment in understandable terms.

Regardless, the ALJ rendered a common sense judgment based on his judgment and the sufficiency of evidence in the record that use of a ME was not required under the regulations and otherwise unwarranted. Plaintiff has failed to show that the ALJ's decision to not solicit expert medical testimony was required to discharge the ALJ's duty to conduct a full inquiry into Plaintiff's allegations or that it was harmful error.

**B.**     **CONSULTATIVE EXAMINER**.

Plaintiff fails to adequately explain why a consultative examination is required in this case. Nevertheless, he suggests that the ALJ erred in failing to order a consultative examination to assist in making the decision of disability.

Where the medical evidence in the record is inconclusive, a consultative examination is required for proper resolution of a disability claim.  20 C.F.R. § 404.1519a(b) (Thomson Reuters 2014).  In other words, after the claimant satisfies his or her burden to show a reasonable possibility of a severe impairment, the ALJ bears the responsibility to order a consultative examination if it is necessary to resolve the impairment issue.  20 C.F.R. § 404.1517 (Thomson Reuters 2014).  Generally, the ALJ should consider a consultative examination in situations where a claimant's medical records do not contain needed additional information or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record.  20 C.F.R. §404.1517 (Thomson Reuters 2014).

Having outlined the considerations guiding a decision on the issue, the Magistrate is persuaded that ALJ made an informed decision without ordering a consultative examination and that there was no reason to impose a duty on the ALJ to obtain a consultative decision.  Plaintiff had the burden to make sure the evidence in the record was sufficient to suggest a reasonable possibility that a severe impairment or impairments existed.  When he satisfied this burden in that regard, it became the responsibility of the ALJ to order a consultative examination if such an examination was necessary or helpful to resolve the issue of impairment.  The ALJ identified the issues and determined that Drs. Martinez and Kalepu provided the objective evidence suggesting conditions that would have a material impact on the disability decision.  Their opinions were of material assistance in resolving the issue of disability and additional tests were not required to explain the diagnoses already in the record.

In conclusion, there is no basis to conclude that the ALJ erred in failing to request a consultative examination and the Magistrate finds no error in the ALJ's decision in that regard.

**2.**     **RESIDUAL FUNCTIONAL CAPACITY**.

Plaintiff argues that the ALJ improperly substituted his own judgment for that of a medical expert in assessing residual functional capacity.

**A.**     **THE LAW**.

At the ALJ review level, the ALJ is responsible for assessing residual functional capacity. 20 C.F.R. § 404.1546(c) (Thomson Reuters 2014). Residual functional capacity is an administrative assessment based on a consideration of all other evidence in the case record about what an individual can do despite his or her impairment. TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, SSR 96-5p, 1996 WL 374183, *4 (July 2, 1996).

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Moss v. Commissioner of Social Security*, 2014 WL 2052238, *18 (N.D.Ohio,2014) (*citing Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir.2004)). Such decision must be based on all relevant medical and other evidence. *Id*. (*citing* 20 C.F.R. § 20.1545(a)(3)).

The Commissioner bears the responsibility of developing the claimant's complete medical history. *Id.* (*citing* 20 C.F.R. § 20.1545(a)(3)). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." *Id.* (*citing* 20 C.F.R. § 20.1545(a)(3)). Responsibility for deciding residual functional capacity rests with

23

the ALJ when cases are decided at an administrative hearing.  *Id.* (*citing Webb*, 368 F.3d at 633).

**B.      THE ANALYSIS**

To the extent that Plaintiff is arguing that a ME must make a function by function determination of residual functional capacity, the Magistrate disagrees.  The regulation makes it clear that at the administrative hearing review level, the ALJ makes a residual functional capacity determination based on all of the record evidence.  There is no authority requiring the ALJ to secure ME testimony as a condition precedent to assessing residual functional capacity.

The ALJ was not attempting to evaluate and interpret background medical test data and therefore ME testimony or evaluation was not warranted.  Neither is there evidence that the ALJ couched Plaintiff's residual functional capacity in his own terms or substituted his conclusions for that of a medical expert.  Rather, the ALJ included in a narrative discussion, sufficient medical and psychological evidence such as Plaintiff's written report of physical activity, his testimony of minimal inactivity, his blindness in one eye and limited sight in the other eye, his treatment for Hepatitis C and observations by Drs. Kalepu and Martinez, all of which he considered in making a reasoned determination of Plaintiff's residual functional capacity (Docket No. 13, pp. 22-24 of 2143).  The ALJ appropriately discounted the assessments of consultative examiners whose opinions were based on obsolete data (Docket No. 13, p. 24 of 2143).

The Magistrate is persuaded that the ALJ made a function-by-function assessment of Plaintiff's limitations in reliance on the medical evidence and Plaintiff's inability to do past relevant work.  No ME testimony was required.  Since the ALJ satisfied the regulatory requirements, the Magistrate rejects Plaintiff's contention and affirms the ALJ's assessment of Plaintiff's residual functional capacity.

**3.      THE TREATING PHYSICIAN ANALYSIS.**

Plaintiff acknowledges that the ALJ gave "great weight" to the opinions of Dr. Martinez;

24

however, the ALJ failed to give controlling weight to her opinions.

## A.    THE LAW

The Commissioner imposes certain standards on the treatment of medical source evidence. *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375 (6thCir.2013) (*citing Cole v. Astrue*, 661 F.3d 931, 937 (6thCir. 2011)).  These standards, set forth in administrative regulations, describe (1) the various types of evidence that the Commissioner will consider, *Id.* (*citing* 20 C.F.R. § 404.1512); (2) who can provide evidence to establish an impairment, *Id.* (*citing* 20 C.F.R. § 404.1513); and (3) how that evidence will be evaluated, *Id.* (*citing* 20 C.F.R. § 404.1520b).  Such evidence may contain medical opinions from psychiatrist that reflect judgments about the nature and severity of the claimant's impairments, inclusive of symptoms, diagnosis and prognosis, physical and mental restrictions, and what the claimant can still do despite his or her impairments.  *Id.* (*citing* 20 C.F.R. § 404.1527(a)(2)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c).  *Id.*

As a general matter, treating-source opinions must be given "controlling weight" if two conditions are met:  (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."  *Id.* at 375-376 (*citing* 20 C.F.R. § 404.1527(c)(2)).  If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.  *Id.* at 376 (*citing* § 404.1527(c)(2)-(6)).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion.  *Id*. (*citing* § 404.1527(c)(2)).  These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (SOC. SEC. RUL. NO. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6[th]Cir.2004)).

### B.     CONTROLLING WEIGHT.

Plaintiff argues that the ALJ failed to properly articulate a controlling weight analysis consistent with *Gayheart*, *supra*, and provide any reason for the weight actually assigned to Dr. Martinez' opinion.

Here, the ALJ has indicated unequivocally that Dr. Martinez is the sole treating source to establish that Plaintiff suffered from panic attacks with agoraphobia (Docket No. 13, p. 23 of 2143). The ALJ articulated specific reasons–(1) Dr. Martinez' specialty in psychiatry; (2) the long term treatment relationship with Plaintiff; (3) her observations during the treatment; (4) the continual adjustment to medication therapy; and (5) Plaintiff's assessment of his progress–for according deferential weight to Dr. Martinez' opinions (Docket No. 13, pp. 23-24 of 2143).  Obviously, the ALJ assigned significant weight to Dr. Martinez' opinion and structured the decision to remove any doubt as to the amount of weight given this treating source and the reasons for finding that Plaintiff's panic attacks with agoraphobia is a severe impairment.

The ALJ did not err in labeling or giving great weight to the opinion of Dr. Martinez where in reality, he attributed controlling weight to such opinions and justified it with referrals to substantial evidence.  The Magistrate cannot find that in making this determination, the ALJ misstated or misapplied principles of the controlling weight analysis.

### 4.     FAILURE TO CONSIDER DR. MARTINEZ' MAY 12, 2012 OPINION.

Plaintiff argues that the ALJ should have considered Dr. Martinez' May 12, 2012 opinion that

Plaintiff would likely be absent from work about two to three times month (Docket No. 13, p. 1942 of 2143). Based on this factor alone, Plaintiff suggests that the ALJ should have considered him disabled or at least remanded the case to the ALJ for consideration of this fact.

    **A.**    **THE LAW**.

    It is well-established that medical evidence is relevant to prove a disability only while the claimant enjoyed insured status. *Koehler v. Commissioner of Social Security*, 2014 WL 273287, *16 (N.D.Ohio 2014) (*citing Anderson v. Commissioner of Social Security*, 440 F.Supp.2d 696, 699 (E.D.Mich.,2006) (*citing Estep v. Weinberger*, 525 F.2d 757, 757-758 (6ᵗʰ Cir.1975)). Medical evidence that postdates the insured status date may be, and ought to be, considered, insofar as it bears on the claimant's condition prior to the expiration of insured status. *Id.* (*citing Begley v. Mathews*, 544 F.2d 1345, 1354 (6ᵗʰ Cir.1976) (stating that "[m]edical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time"); *Higgs v. Bowen*, 880 F.2d 860, 863 (6ᵗʰ Cir.1988)).

    **B.**    **THE ANALYSIS**.

    It is undisputed that Plaintiff's submitted  medical evidence showing he suffered from a disabling condition before the date last insured status expired on September 30, 2008 and that he had the same impairment when Dr. Martinez completed the PSYCHIATRIC/PSYCHOLOGICAL IMPAIRMENT QUESTIONNAIRE on May 12, 2012. Her opinion is only relevant to a disability determination where the evidence relates back to the Plaintiff's limitations prior to the date last insured. While Dr. Martinez affirms the retroactive diagnosis more than three years beyond the date last insured, her conclusions in this questionnaire are of little probative value since they fail to establish proof of disability or functional limitations contemporaneous with the eligibility period. The ALJ did not err by failing to give controlling weight to Dr. Martinez' May 12, 2012 opinion for the reason that Plaintiff failed to show

it was relevant to his proof of disability before the expiration of his insured status.

### IX. CONCLUSION.

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   October 28, 2014